SAMANTHA M. WILLIAMS (Md. Bar No. 0012190024)
*PRO HAC VICE* APPLICATION PENDING
williamssam@sec.gov
LAURA K. BENNETT (DC Bar No. 985573)
*PRO HAC VICE* APPLICATION PENDING
bennettlaur@sec.gov
100 F Street, NE
Washington, DC 20549
Tel: (202) 551-4061 (Williams)
Fax: (804) 708-6087

LOCAL COUNSEL
DANIEL BLAU (Cal. Bar. No. 305008)
blaud@sec.gov
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Tel: (323) 965-3306
Fax: (213) 443-1904

Attorneys for the Plaintiff
Securities and Exchange Commission

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    vs.<br><br>AHMAD HARIS TAJYAR,<br><br>    Defendant,<br><br>    and<br><br>ERIC LEO MARSOUBIAN,<br><br>    Relief Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "SEC"), for its Complaint against Defendant Ahmad Haris "Harry" Tajyar ("Tajyar") and Relief Defendant Eric Leo Marsoubian ("Relief Defendant Marsoubian"), alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

2. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. Specifically, Tajyar engaged in manipulative trading of Company stock and other fraudulent acts in this district. Venue is proper in this district because Tajyar and Relief Defendant Marsoubian reside in this district.

## SUMMARY

3. From February 2017 through November 2017, Defendant Ahmad Haris "Harry" Tajyar, a securities fraud recidivist, engaged in a manipulative trading and false promotional campaign in connection with the stock of a company called Atlas Technology International, Inc., an alleged touchscreen technology business formerly known as Sweets & Treats, Inc. (the "Company"). Tajyar's manipulative and fraudulent trading practices gave the appearance of an active market in a sparsely traded technology penny stock. Tajyar amplified the effect of his manipulative trading by engaging in a promotional campaign designed to give the false impression that neutral third parties were interested in the Company and that Tajyar had no financial stake in the success of the Company.

4.  To lay the groundwork for his fraudulent scheme, Tajyar gained control of Sweets & Treats, Inc., a small, private, in-home baking company, and using stock owned by Marsoubian and others secured the regulatory approval required for some of its shares to be publicly traded. Sweets & Treats, Inc. changed its name to Atlas Technology International, Inc. and claimed to operate as a touchscreen technology company. After securing control over a portion of the Company's shares, from February to November 2017, Tajyar executed a series of wash sales, matched orders, and other manipulative trades to give the appearance of an active market in the Company's thinly traded stock. During this time period, Tajyar executed a series of sales at the end of certain trading days at prices higher than daily market trading and supplied materially false and misleading information to the public in connection with the Company's promotional campaign.

5.  Tajyar's scheme allowed him to profitably sell Company shares he controlled into the open market. Tajyar sold shares that he controlled in Relief Defendant Marsoubian's brokerage account and allowed Marsoubian to keep a portion of the profits from the sale of those shares.

6.  In December 2017, the SEC suspended trading in the Company's stock due to concerns about the accuracy of the publicly available information disseminated by the Company.

7.  Tajyar's actions violated the anti-fraud and manipulative trading provisions of the federal securities laws. The SEC requests, among other things, that the Court enjoin Tajyar from further violating the federal securities laws as alleged in this complaint and order Defendant to pay a monetary penalty based upon his violations.

8.  Relief Defendant Marsoubian received ill-gotten funds from Tajyar's fraud and has no legitimate interest in the funds he received. The SEC requests that the Court order Relief Defendant Marsoubian to disgorge these funds and pay prejudgment interest thereon.

**DEFENDANT, RELIEF DEFENDANT, AND THE COMPANY**

9. **Tajyar**, age 45, resides in Porter Ranch, California and has resided in this district throughout the relevant time period. On November 30, 2010, Tajyar pled guilty in this Court to criminal securities fraud in *United States. v. Tajyar, et al*, Case No. 2:10cr313 (C.D. Cal.). In connection with the same conduct, Tajyar consented to the entry of a civil judgment that permanently enjoined him from violating the anti-fraud provisions of the federal securities laws, *SEC v. Tajyar, et al.,* No. CV 09-03988 JFW (PJWx) (C.D. Cal.), and an SEC administrative order barring him from serving as an investment adviser.

10. **Marsoubian**, age 57, resides in Canoga Park, California.

11. **Atlas Technology International, Inc. f/k/a as Sweets & Treats, Inc.** was incorporated as a California, in-home bakery business in 2011. In 2014, the Company re-incorporated in Delaware. In 2016, the Company changed its name to Atlas Technology International and purported to be in the business of designing, developing, and distributing touchscreen technology.

**FACTUAL ALLEGATIONS**

**I.    Tajyar Arranged for Company Shares to be Quoted on a Public Market.**

12. In spring 2011, a 24 year-old resident of Sylmar, California (referred to herein as "Person A") started Sweets & Treats, Inc., an in-home baking business, to sell baked goods to her friends and family.

13. In approximately 2014, Tajyar's cousin convinced Person A to take the Company public so that she could raise money. Tajyar stepped in to assist Person A in taking the Company public. Tajyar soon controlled all decisions regarding the Company. Person A remained the president in name only.

14. To engage in manipulative trading, Tajyar needed to obtain approval for the Company stock to be quoted on a public market. To obtain the approval, the Company: a) filed a registration statement with the SEC that identified a

sufficient number of shareholders who had purchased stock; and b) provided an opinion letter for submission to the Financial Industry Regulatory Authority ("FINRA") that the Company had more than nominal business operations and assets.

15. To obtain a sufficient number of shareholders, Tajyar attempted to recruit friends and family in this district to purchase Company stock and convinced at least one friend, Relief Defendant Marsoubian, to buy Company stock for himself and his family members.  Ultimately, the Company did not locate enough individuals who paid for Company shares with their own funds.

16. Nevertheless, Tajyar caused the Company to file a registration statement with the SEC giving the false impression that, in addition to Relief Defendant Marsoubian and his family, more than twenty-five other individuals had purchased shares of Company stock with their own funds in a qualified private offering.  The registration statement became effective on June 5, 2015, meaning these shares could be sold to the general public.

17. While the Company's operations and assets had always been nominal, and, as of February 2015, the Company had nearly stopped doing business altogether, Tajyar also caused the Company to submit an opinion letter to FINRA designed to convince it that the Company had more than nominal operations and assets.  Based on these false statements, and based upon the fraudulently-obtained registration statement, in August 2015, FINRA granted approval for the Company's stock to be quoted.

18. On August 5, 2015, the Company's stock began being quoted on a public market owned and managed by OTC Markets.

19. In 2016, the Company changed its name to Atlas Technology International and purported to be in the business of designing, developing, and distributing touchscreen technology.

///

### II. Tajyar Acquired Control of Trading Accounts.

20. Tajyar had two friends, Person C, who resides in this district, and Person D, who allowed Tajyar to trade in their accounts.

21. Tajyar had another friend, Person E, who also lives in this district, who was granted shares by the Company purportedly for services rendered. Tajyar traded in Person E's account.

22. As described below, Tajyar engaged in manipulative trading of Company stock in his own account as well as in the accounts of Person C, Person D, and Person E.

### III. Tajyar Engaged in Manipulative Trading and Fraud in Connection with the Company's Promotional Campaign.

23. From February 2017 until late November 2017, Tajyar placed trades in the Company stock – in his own account and in the accounts that he controlled – designed to create the appearance of an active market in Company stock and that the Company's stock was trading at increased prices.

24. Tajyar's manipulative trading practices included the following:

(a) "Marking the Close," which is trading a stock at a higher price than the most recent transaction shortly before 4:00 pm EST, when the securities markets close. A security's "closing" price is particularly significant because it is widely reported in financial publications, is used to determine a security's performance over a specific time, and is typically the price most heavily relied upon to make investment decisions.

(b) "Matched Orders," which is entering a buy (or sell) order from one account knowing that a sell (or buy) order from a different account at substantially the same time, amount, and price will be entered.

(c) "Wash Sales," which is when the same customer enters a buy order and a sell order at or near the same time such that the ownership of the stock does not change.

5

25.  Tajyar's intent in engaging in matched orders, wash sales, and marking the close served no economic purpose as evidenced by the fact that he sold low and bought high; bought stock at higher prices than the most recent transaction at the end of the day; and sold and bought shares on the same day from the same account at the same price. Tajyar's intent in engaging in these trades was to create the false and misleading appearance of active trading in Company stock, a false and misleading appearance with respect to the market in Company stock, and to induce others to trade in Company stock by artificially creating price increases and active trading in Company stock.

26.  Tajyar placed orders from his computer in this district by logging into his own brokerage account, and the accounts of Person C, Person D, and Person E, through the internet, which is an instrumentality of interstate commerce.

### A. Tajyar Began Manipulative Trading to Artificially Create the Appearance of an Active Market in Company Stock.

27.  Prior to February 2017, only 300 shares of Company stock had ever been traded.

28.  During the month of February 2017, Tajyar bought 67,000 Company shares through the Person C account and sold almost half of them. In addition, Tajyar bought 11,200 shares through the Person D account and sold all of them. Tajyar made no profit from these buy and sell transactions.

29.  During the month of March 2017, Tajyar bought 61,100 Company shares through the Person C account and sold approximately 80% of them. Tajyar bought 21,400 shares through the Person D account and sold all of them. Tajyar made no profit from these buy and sell transactions.

30.  On March 28, 2017, Tajyar placed sell orders through the Person C account and his own account. By 2:32 pm these trades had not executed and no other trades had occurred in the market that day. Between 2:32pm and 2:38pm, Tajyar placed three buy orders for 2,000 shares each in the Person D account. Two

of these Person D buy orders were satisfied with the sell orders Tajyar had placed through the Person C account and another 1,500 were satisfied with shares that Tajyar had offered in the morning from his own account. Later on that day, Tajyar placed a buy order in the Person C account for 15,000 shares and, approximately one-half hour later after no trades had occurred at that price in the market, Tajyar placed two sell orders in that same Person C account. The buy and sell orders executed as wash sales and resulted in the largest trades of the day. In total on March 28, 2017, the Person C and Person D accounts bought 21,000 shares, which was almost 90% of the buy volume that day. The Person C and Tajyar accounts sold 22,900 shares, which accounted for almost 98% of that day's sell volume.

31. On March 31, 2017, with less than five minutes before the market close, Tajyar placed an order and bought 500 shares in Person C's account at $0.09 above the current market price of $0.26 for Company stock. This trade set the closing price at $0.35 per share instead of $0.26 per share.

32. On the morning of April 4, 2017, Tajyar placed orders to sell 30,000 shares of Company stock from the Person C account. When, by 3:36 pm, no buyers had purchased the offered shares and there had been no other trades in the stock, Tajyar bought 3,000 shares of these shares, in three separate transactions using his own account. In total for the day, Tajyar bought 4,200 shares, which represented 100% of the trading volume for the day.

33. On April 13, 2017, Tajyar engaged in manipulative trading between the Person C account and Tajyar's own account. First, Tajyar placed multiple orders to buy in the Person C account between 9:36 and 9:50am. In between placing buy orders in the Person C account, at 9:42 am, Tajyar placed an order to sell 1,000 shares from his own account. This ultimately resulted in Person C buying 1,000 shares at $0.40 per share from Tajyar. Tajyar continued to buy other shares in the open market with the Person C account and caused the price to increase to almost $0.54 per share. Later in the afternoon, Tajyar placed an order to sell 4,000 shares

7

from his own account at the best available price. Approximately 2 ½ minutes later, Tajyar placed a buy order for 4,000 shares at $0.49 per share in the Person C account. Because the stock was so thinly traded, the Person C buy order was satisfied with the shares Tajyar sold from his account. This trading constituted matched orders. Tajyar continued to buy other shares in the open market with the Person C account and caused the price to increase to $0.72 per share. In total on April 13, 2017, Tajyar bought 23,500 shares through the Person C account, which represented over 65% of the buy volume that day.

34. On June 19, 2017, six minutes before the market close, Tajyar bought 1,000 shares in the Person C account for $0.174 above the current market price. Tajyar's trade moved the price from $0.556 per share to $0.73 per share and set the closing price.

### B. Tajyar Created the Materially Misleading Appearance that Neutral Third Parties were Interested in the Company and that Tajyar had no Stake in the Company's Success.

35. Having created the appearance of an active market in the stock, in September 2017, Tajyar began a promotional campaign for Company stock designed to give the impression that neutral third parties were interested in the Company and that Tajyar had no financial stake in the success of the Company.

36. On September 27, 2017, Tajyar led an earnings release conference call on behalf of Atlas. Tajyar enlisted his friend, Person B, to pose as an employee of a fictitious financial firm during the conference call and ask a question about the Company (the "Person B Pretense"). After Tajyar had answered Person B's question, Person B congratulated the Company on its progress. The Person B Pretense created the misleading impression that Person B was a neutral third party interested in the Company.

37. On November 7, 2017, Tajyar participated in iHeartRadio's "CEO Money" Business Radio Show broadcast. Tajyar stated that the stock had been

"picked up" by an analyst with a buy rating, without disclosing that the analyst was being paid by Tajyar's company to create and disseminate reports about the Company. Tajyar's omission created the misleading impression that another neutral third party was interested in the Company.

38. During the November 7, 2017 radio program, Tajyar also falsely stated that he was neither buying nor selling Company stock, creating the impression that Tajyar had no financial stake in the success of the Company and concealing his ongoing manipulative trading practices.

39. Tajyar knew that Person B was not associated with a financial firm, knew that an analyst had only "picked up" the Company stock because he was being paid to do so, and knew that he was buying and selling Company stock. Tajyar, through these actions, intended to deceive potential investors.

40. Tajyar's omissions and misrepresentations were material because whether Tajyar had a financial interest in the Company when promoting the stock and whether Tajyar had compensated an analyst for his reports is the type of information that reasonable investors rely on and would find important in deciding whether to invest in the Company.

**C. While Cashing Out his Holdings in Company Stock, Tajyar Engaged in Trades to Manipulate the Price.**

41. As the promotional campaign was nearing the end, Tajyar engaged in additional trading to create the appearance that the market price for the shares had increased. Tajyar continued his practice of "marking the close," as well as simply just offering the stock at higher prices than the market activity represented.

42. On November 16, 2017, less than ten minutes before the market close, Tajyar bought 100 shares of Company stock through Person E's account for $0.31 per share, moving the price from $0.25 per share to $0.31 per share. Subsequently, a third party executed a trade in Company stock at a lower price, which re-set the market price at $0.2638 per share. Less than a minute before the close, Tajyar

bought an additional 1,000 shares through the Person E account at $0.31 per share, which set the closing price for that day.

43. On November 21, 2017, Tajyar sold 20,000 shares of the Company's stock using the Person E account to a third party at 2:57 pm, approximately an hour before the close. Approximately eleven minutes later, Tajyar bought 1,000 shares of Company stock for Person E's account at $0.039 higher than the price of the shares that he had just sold. Tajyar's trade moved the price from $0.26 per share to $0.299 per share and set the closing price for the Company's stock for that day.

44. In the morning of November 27, 2017, Tajyar sold 19,000 shares of the Company's stock from Person E's account to an unrelated party at prices ranging from $0.26 per share to $0.30 per share, ultimately setting the market price at $0.26 per share. Approximately six minutes later, with no other trades occurring in the market, Tajyar purchased 1,000 shares of the Company's stock using the Person E account at $0.38 per share, thus raising the market price for the shares from $0.26 per share to $0.38 per share. Later in the day, after the market price for the Company's stock had fallen again, Tajyar sold 50,000 shares of Company stock from Person E's account to an unrelated party at prices ranging from $0.21 per share to $0.28 per share. Less than a minute after the last sale, Tajyar bought 1,000 shares of Company stock using the Person E account for $0.3149 per share, thus raising the price from $0.211 per share to $0.3149 per share. No trades occurred between the 1,000 share purchase and 3:55pm, less than 5 minutes before the close, when Tajyar, through the Person E account, made additional purchases of Company stock totaling 24,200 shares raising the price further and setting the closing price for the Company's stock to $0.38 per share.

### D. Tajyar Reaped the Rewards of his Fraud and Shared the Proceeds with Relief Defendant Marsoubian.

45. Tajyar's manipulative trading and other fraudulent acts created a market for the Company stock that did not otherwise exist. Tajyar then sold

Company stock into this manipulated market and Tajyar and his related companies received the proceeds.

46. Between November 13, 2017 and December 1, 2017, Person E's account made $38,604.65 from the sale of Company stock which he gave to Tajyar and a company owned by Tajyar called Red Rock Canyon.

47. Between May and November 2017, Tajyar sold the Relief Defendant Marsoubian family shares. Red Rock Canyon took approximately $82,800 of the sales proceeds and Tajyar took approximately $98,200. Tajyar allowed Relief Defendant Marsoubian to keep $15,267 of the profits.

48. On December 4, 2017, the SEC suspended trading in the Company's stock based on its concerns about the accuracy of the publicly available information disseminated by the Company.

## FIRST CLAIM FOR RELIEF

### Manipulative Trading

### Sections 9(a)(1) and 9(a)(2) of the Exchange Act

### (Tajyar)

49. The SEC realleges and incorporates by reference paragraphs 1 through 48 above.

50. Tajyar violated Section 9(a)(1)(a) of the Exchange Act, 15 U.S.C. §78i(a)(1)(a), by effectuating matched orders.

51. Tajyar violated Section 9(a)(1)(b) of the Exchange Act, 15 U.S.C. §78i(a)(1)(b), by effectuating a wash sale.

52. Tajyar violated Section 9(a)(2) of the Exchange Act, 15 U.S.C. §78i(a)(2), by engaging in price and volume manipulation of Company stock.

53. Unless enjoined, Tajyar will continue to violate Sections 9(a)(1)(a), 9(a)(1)(b), and 9(a)(2) of the Exchange Act.

///

///

# SECOND CLAIM FOR RELIEF

## The Manipulative Trading and Other Fraud

## Section 10(b) of the Exchange Act and Rule 10b-5(a) - (c) Thereunder

### (Tajyar)

54. The SEC realleges and incorporates by reference paragraphs 1 through 53 above.

55. Tajyar designed and implemented the Person B Pretense and made the November 7, 2017 false statement and misleading omission in connection with the purchase or sale of Company stock, which is a security.

56. Tajyar implemented the Person B Pretense during a telephone call and made the November 7, 2017 false statement and misleading omission by radio, which are means and instrumentalities of interstate commerce.

57. Tajyar knew, or was reckless in not knowing, that potential investors would be deceived by the Person B Pretense. Tajyar knew, or was reckless in not knowing, that his November 7, 2017 statement was false and that the November 7, 2017 omission was misleading. Tajyar intended to deceive potential investors in violation of Rule 10b-5(b).

58. Tajyar implemented the Person B Pretense and disseminated the November 7, 2017 misrepresentation and omission, each of which constitute a device, scheme, or artifice to defraud and an act, practice, or course of business which operated, or would operate, as a fraud or deceit upon any person in connection with the purchase or sale of any security in violation of Rule 10b-5(a) and (c).

59. Tajyar's manipulative trading is also a device, scheme, or artifice to defraud and an act, practice, or course of business which operated, or would operate, as a fraud or deceit upon any person in connection with the purchase or sale of Company stock, which is a security, under Rule 10b-5(a) and (c), effected through the means and instrumentalities of interstate commerce.

60. Tajyar knew, or was reckless in not knowing, that his manipulative

trading would create the false and misleading appearance of active trading in Company stock and the market for Company stock, would raise the price of Company stock, and would create trading activity in Company stock.

61. Tajyar intended his manipulative trading to operate as a fraud upon and deceive investors about the nature of the market for the Company's stock.

62. Tajyar violated, and unless enjoined will again violate, Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(a)-(c) thereunder, 17 C.F.R. § 240.10b-5(a)-(c).

## THIRD CLAIM FOR RELIEF

**The Manipulative Trading and Materially False Promotional Campaign**

**Section 17(a)(1) - (3) of the Securities Act**

**(Tajyar)**

63. The SEC realleges and incorporates by reference paragraphs 1 through 62 above.

64. Tajyar implemented the Person B Pretense and made the November 7, 2017 false statement and misleading omission in the offer and sale of Company stock, which is a security.

65. Tajyar knew, was reckless in not knowing, or was negligent in not knowing that potential investors would be deceived by the Person B Pretense. Tajyar knew, was reckless in not knowing, or was negligent in not knowing that the November 7, 2017 statement was false and that the November 7, 2017 omission was misleading. Tajyar intended potential investors to be deceived.

66. Tajyar obtained proceeds from the sale of Company stock into a market manipulated by the November 7, 2017 misrepresentation and omission in violation of Section 17(a)(2).

67. Tajyar implemented the Person B Pretense and disseminated the November 7, 2017 misrepresentation and omission, each of which constitutes a device, scheme, or artifice to defraud and a transaction, practice, or course of

business which operated, or would operate, as a fraud or deceit upon any purchaser of Company stock in violation of Section 17(a)(1) and (3).

68. Tajyar's manipulative trading in the offer or sale of Company stock is also a device, scheme, or artifice to defraud and a transaction, practice, or course of business which operated, or would operate, as a fraud or deceit upon any purchaser of Company stock in violation of Sections 17(a)(1) and (3).

69. Tajyar knew, was reckless in not knowing, or was negligent in not knowing that his manipulative trading would create the false and misleading appearance of active trading in Company stock and a market for Company stock, would raise the price of Company stock, and would create trading activity in Company stock.

70. Tajyar intended his manipulative trading to operate as a fraud upon and deceive investors about the nature of the market for the Company's stock.

71. Tajyar violated, and unless enjoined will again violate, Securities Act Sections 17(a)(1)-(a)(3), 15 U.S.C. § 77q(a)(1)-(a)(3).

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

### (Relief Defendant Marsoubian)

72. The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

73. Relief Defendant Marsoubian received ill-gotten funds in which he has no legitimate interest.

74. It would be inequitable for Relief Defendant Marsoubian to retain the proceeds from Tajyar's violations of the federal securities laws and such proceeds should be disgorged, with prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a final judgment:

  (a) permanently enjoining Tajyar from engaging in the acts, practices and courses of business alleged herein;

  (b) permanently enjoining Tajyar from directly or indirectly, including, but not limited to, through any entity owned or controlled by Tajyar, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Tajyar from purchasing or selling securities listed on a national securities exchange for his own personal account;

  (c) permanently enjoining Tajyar from directly or indirectly, including, but not limited to, through any entity owned or controlled by Tajyar: (i) promoting any issuer of any security, causing the promotion of any issuer of any security, deriving compensation from the promotion of any issuer of any security; or (ii) soliciting any person or entity to purchase or sell any security, or to hold any security as nominee; provided, however, that such injunction shall not prevent Tajyar from purchasing or selling securities listed on a national securities exchange for his own personal account;

  (d) imposing civil money penalties on Tajyar pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

  (e) barring Tajyar from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock under Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

  (f) ordering Tajyar to surrender all shares of Atlas stock held directly or indirectly by him to the transfer agent for cancellation;

  (g) ordering Relief Defendant Marsoubian to disgorge an amount equal to the ill-gotten funds that he received from the activities set forth in this Complaint along with prejudgment interest; and

15

(h) ordering any other and further relief the Court may deem just and proper.

Dated: August 13, 2021              Respectfully Submitted,


                                    */s/ Daniel O. Blau*
                                    Daniel O. Blau
                                    Samantha Williams
                                    Laura K. Bennett

                                    Attorneys for Plaintiff
                                    Securities and Exchange Commission